# CASES

## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT OF ILLINOIS.

ELDORADO, MARION AND SOUTHWESTERN RAILROAD CO.

*v.*

M. G. SIMS *et al.*

*Opinion filed June 19, 1907.*

1. EMINENT DOMAIN—*title to coal underlying right of way remains in owner.* The title to coal or minerals underlying a strip of land condemned for railroad right of way remains in the owner of the land, and the latter has the right to remove such coal or minerals, subject, only, to the easement of safe support for the surface of the right of way and non-interference with its use for the purpose for which it was condemned.

2. SAME—*evidence that coal had been found on lands in vicinity not admissible.* In a proceeding to condemn, for railroad right of way, a strip of land through a farm upon which no mine exists and no borings for coal have ever been made, so that the existence of coal underlying the land is wholly a matter of conjecture, evidence that coal had been found underlying land several miles from that condemned is incompetent, and is reversible error where it appears the jury based its estimate of value upon such evidence.

3. SAME—*right of a petitioner to make stipulations.* A railroad company seeking to condemn land for its right of way may stipulate to do things tending to lessen the damages to the land owner, provided the things agreed to be done will not render the use of the strip of land for right of way purposes unsafe to the public.

Appeal from the County Court of Williamson county; the Hon. W. F. Slater, Judge, presiding.

Colp & Ferrell, and William A. Schwartz, for appellant.

Denison & Spiller, for appellees.

Mr. Chief Justice Hand delivered the opinion of the court:

This was a proceeding commenced by the appellant in the county court of Williamson county against the appellees, under the Eminent Domain act, to acquire title to a strip of land one hundred feet in width across the east end of the appellees' farm, as a right of way upon which to construct its railroad. The strip of land sought to be taken contained 10.93 acres. The jury fixed the value of the land taken at $1100 and the damage to the land not taken at $900, and the court, after overruling a motion for a new trial, rendered judgment upon the verdict, and an appeal has been prosecuted to this court by the railroad company.

The farm of appellees contains about five hundred acres, is a mile and a half in length from east to west and about a half mile wide north and south, and the proposed right of way crosses diagonally the east one hundred and twenty acres thereof. The farm, at the time the petition was filed, was used for pasture and upon which to grow grain. The witnesses differed greatly in their estimate of the value of the land taken and the damage to the land not taken. The estimate of the value of the land taken, when used for agricultural purposes, ranged from $30 to $60 per acre, and the damages to the land not taken, from a nominal sum to $500. It was claimed, however, by a number of the witnesses that the farm had a special value by reason of the fact that coal had recently been discovered in its vicinity,

and numerous witnesses testified by reason of that fact the land was enhanced in value at least $50 per acre, and several witnesses testified in view of the fact that the surface was underlaid with a heavy vein of coal the land was worth $100 per acre, and the jury by their verdict appear to have been controlled by that testimony. The appellant objected to the admission of any evidence which tended to show that coal had been found in the vicinity of the land, but the court permitted several witnesses to testify that coal had been discovered in the vicinity of the land sought to be taken and that the farm of appellees was supposed to lie in a valuable coal field. No coal had, however, been found in the land of appellees or within some distance therefrom.

The only testimony that bore, even remotely, upon the subject of appellees' land being underlaid with coal was that of a witness, Gill, who testified, in substance, as follows: "I live about a mile north of the Sims farm. I have been engaged in the business of boring holes in the locality. About three months ago I made a boring on J. B. Bruce's land, about three-quarters of a mile north-west of the Sims farm. About three years ago we drilled on Mr. Jeff Sanders' land, which is about two miles from the Sims land. I was present when the borings were made and made the log myself. We found minerals. It was black coal, I reckon. That is what they pronounced it, I suppose. It was a little over three hundred feet to the coal. The vein was a little better than eight feet thick. It had a tolerably fair roof, composed of stone and slate. About seventy or eighty feet below the first vein there was a second vein, a little better than five feet thick. I didn't bore any on the Sims land. I don't know whether there is any coal under the Sims land or not. I don't know of anyone drilling on the Sims land. We can't tell whether or not there is any coal under land without drilling. Where we did drill we found something black, which we supposed was coal. I might have been mistaken about it. Before we came to the vein at the depth

of three hundred feet we went through several kinds of rock, limestone, sand rock and slate. Some layers of limestone were twelve, feet and some three or four feet thick. The layers of sandstone were from ten to fifteen feet thick. We went about twenty-five feet until we came to the first layer of stone. We then went through two hundred and seventy-five feet of stone and slate until we struck the first vein of whatever it was. The coal I found on the Bruce land was pretty fair coal. It is a fact that you bore at one place and find coal and bore at another and don't find any. There is no certainty about finding coal until you find it. You might bore at one place and find coal and then bore a quarter of a mile away and not find any. That is the way it runs." And a witness, J. T. Otey, who stated, in substance: "I live about three miles north and west of the Sims land. There have been borings for coal on my land, which is about two and one-half miles from the Sims land. They found coal at a distance of one hundred and eighty-six feet. The vein was supposed to be eight feet and four inches. The roof was rock and slate. I was interested in a boring half a mile north from the first one I bored. It was on the Sanders land we found coal. I know there is a mine contracted to be sunk on the Sanders land. The mines I have been speaking of are not on the Sims land. The closest one,—this one I spoke of being sunk,—would be possibly three and one-fourth miles from the Sims land. I don't know anything about what is under the Sims land. There has been no borings there, as far as I know."

The testimony of these witnesses, when taken as a whole, does not even tend to show that the appellees' land was underlaid with coal, and for that reason the evidence was clearly incompetent, and the court committed reversible error in permitting the same to go to the jury. Mr. Lewis, in his work on Eminent Domain, (1st ed. sec. 486,) says: "It is not competent to go into the value of coal claimed to be underneath the surface, no mine having been

opened and the existence and extent of coal in the land be-ing wholly a matter of opinion."

The appellant, after the court had permitted the evidence above referred to to go to the jury, offered to stipulate in writing that it would make no claim to the coal, if any, underlying the land sought to be condemned, and that the appellees should have the right, without let or hindrance on the part of appellant, to mine and remove the coal from said strip in the usual and customary manner of mining coal and without regard to the railroad to be constructed on said right of way, which stipulation the court refused to permit the appellant to file, and thereupon the appellant offered the following instruction, which the court declined to give to the jury:

"The court instructs you, as a matter of law, that where land is taken for railroad tracks without the consent of the owner, that the fee of such land remains in the owner subject to the use for which it is taken; and in this case, if you find, from the evidence, that said strip of land taken for right of way is underlaid with a vein of coal, the court instructs you that, subject to the use for which the land is taken, the title to said coal remains in the defendants, and that, subject to the use for which the land is taken, the defendants would have the right to run entries and tunnels through said coal underlying said right of way in order to connect and mine the coal veins on either side of the said right of way."

Section 13 of article 2 of the constitution provides: "The fee of land taken for railroad tracks, without consent of the owners thereof, shall remain in such owners, subject to the use for which it is taken." It would seem clear, under this provision of the constitution, that appellees would retain the fee simple title to the strip of land sought to be acquired, after the appellant had acquired the right, by condemnation, to use the same for right of way purposes, and that the retention of the fee title thereto would permit the

appellees to remove the coal from beneath said strip, and to connect the coal, if any, upon either side of the strip by tunnels or otherwise, provided in so doing they did not impair the right of the appellant to use the strip for right of way purposes by removing the support from beneath the surface so as to interfere with the use of the strip for the purposes for which it had been acquired by condemnation.

In *Southern Pacific Railroad Co.* v. *San Francisco Savings Union,* 146 Cal. 290, (106 Am. St. Rep. 36,) in discussing this subject the court say: "Whatever minerals lie beneath the right of way are reserved to the owner, and wherever such minerals are *in situ,* underlying this right of way, while he may not enter upon it to take them, (because the nature of the easement requires exclusive possession of the surface by the company,) he can drift from tunnels sunk upon his adjoining land and do so, leaving, however, sufficient support for the easement imposed. Subject to this support the right of the owner of the land to take out all the minerals beneath the right of way is absolute. Under the condemnation the railroad company acquires the permanent and exclusive control of the surface of the land, but it acquires nothing more. It acquires no title to the minerals beneath the surface, and, of course, no right to dig beneath the surface for the purpose of appropriating them, and if it should undertake to do so could be restrained at the instance of the owner of the underlying fee. While the title to the minerals underneath the right of way is reserved exclusively to the owner of the land across which it is condemned, there is no doubt that by being restricted from entering upon it it may be much more difficult and expensive for him to take them out,—far more so than if he could operate directly over the land which has been appropriated under the easement; and it may be that much valuable mineral would have to be left to afford surface support, or if this were taken out a substituted surface support would have to be provided by the owner. But evidence of all these mat-

ters would be submitted to the court and jury and would enter as substantial factors in determining the value of the easement. They would not affect the reserved right of ownership in the fee."

And the Supreme Court of Iowa, in *Hollingsworth* v. *DesMoines and St. Louis Railway Co.* 63 Iowa, 443, in discussing this subject, on page 444, say: "It is certainly true that a railway corporation acquires but a limited right or interest in lands condemned, under the statute, for right of way purposes. It is empowered by the statute (section 1241 of the code) to take and hold so much real estate as may be necessary for the location, construction and convenient use of its railway, and to take, remove and use for the construction and repair of its railway and its appurtenances, any earth, gravel, stone, timber or other material on or from the land so taken. The right acquired by it by virtue of the condemnation proceedings is to occupy and use the surface of the land taken for the purposes of its railway, and to appropriate and use so much of the earth or other material upon the land as may be necessary for the construction and repair of its road. The owner of the land is not divested of his title, and the interest remaining in him may in some cases be of great value. If the land should be underlaid with stone, coal or other mineral, the owner would have the right, doubtless, to quarry or mine the same, provided this could be done without interfering with the use of the surface by the railroad company; (*Dubuque* v. *Malony,* 9 Iowa, 450; *DesMoines* v. *Hall,* 24 id. 234;) and he would doubtless have the right to remove from the surface any of the materials enumerated in the statute which are not required by the railroad company for the use to which it is authorized to appropriate them."

As was held in *Sexton* v. *Union Stock Yard and Transit Co.* 200 Ill. 244, when a railroad company takes a perpetual easement in the surface of land for right of way purposes the fee remaining in the owner often would be of little value.

Such would be the case with reference to agricultural lands or with lots, where the surface is the only portion of the property suitable for use. Such would not be the case when the land taken was underlaid by valuable mineral deposits, if the same could be utilized by the owner, subject to the easement acquired by the railroad company in the property. In *Eldorado, Marion and Southwestern Railroad Co.* v. *Everett,* 225 Ill. 529, a stipulation similar to the one offered to be filed in this case was filed without objection. In that case it was conceded the land sought to be taken was underlaid with coal, while in this case that fact was contested. From the evidence of the witnesses Gill and Otey the coal found in the neighborhood of the Sims land was located far below the surface and was covered by strata of rock, and on the view that the land of appellees contained coal, there is no evidence that to mine and remove the coal from said strip in the usual and customary manner of mining coal would in any manner interfere with the safe use of the surface of said strip for railroad right of way purposes. It is not uncommon, in condemnation proceedings to acquire property for right of way purposes, to permit the party seeking to condemn, to stipulate as to the manner in which the land shall be used, or that the party seeking to condemn will perform certain things connected with or upon the land, such as fencing the right of way, erecting crossings, putting in culverts, underground passageways, etc. We think the right to make stipulations upon the part of the condemning party which do not affect the rights of the public by rendering the right of way sought to be acquired unsafe to the traveling public for use for railroad right of way purposes, and which tend to lessen the damages to the land owner, is in conflict with no rule of public policy. If, however, the evidence shows the matter sought to be covered by the stipulation would seriously impair the safety of the operation of the railroad to the traveling public, the court might properly refuse to permit the stipulation to be made.

As there is no evidence in this record showing the removal of the coal, if any, which might be found in the land here sought to be taken, when removed in the usual manner, would render the use of said strip unsafe to the public for use for right of way purposes, we think the court erred in refusing to permit said stipulation to be filed.

We think, also, the instruction offered upon behalf of the appellant a correct statement of the respective legal rights of the railroad company and the land owner in the right of way and the underlying coal, if any, in the strip of land sought to be taken, and should have been given.

For the errors indicated the judgment of the county court will be reversed and the cause remanded to that court for a new trial in accordance with the views herein expressed.

*Reversed and remanded.*